AO 91 (Rev. 11/11) Criminal Complaint

AUSA Matthew S. Ebert (312) 353-5354

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

RICHARD K. BOOY

CASE NUMBER:

# 16 CR 839

MAGISTRATE JUDGE WEISMAN

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about June 2014 through in or about December 2016, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant RICHARD K. BOOY, violated:

| Code Section | Offense Description |
|---|---|
| Title 18, Unites States Code, Section 1341 | engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts, and, for the purpose of executing the scheme, sent and caused the sending of a mailing by commercial interstate carrier, namely, documents sent via FedEx, on or about October 21, 2015 |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

EDUARDO ANDRADE
Inspector, U.S. Postal Inspection Service

Sworn to before me and signed in my presence.

Date: Dec. 21, 2016

Judge's signature

City and state: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
Printed name and Title

# FILED

DEC 21 2016

M. DAVID WEISMAN
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS | ss

## **AFFIDAVIT**

I, Eduardo M. Andrade, being duly sworn, state as follows:

1.     I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since September 1998. I am currently assigned to the Chicago Division of USPIS. My primary duties include investigating criminal violations of law involving the United States Mail including, but not limited to, mail fraud and wire fraud as set forth in Title 18, United States Code, Sections 1341 and 1343. In my capacity as a Postal Inspector, I also investigate bank fraud, money laundering, and other financial crimes. I have received specialized training in the enforcement of federal laws and have been involved in various investigations involving the execution of search warrants, the review of subpoenaed financial documents, physical surveillance, and arrests.

2.     Because this affidavit is being submitted for the limited purpose of establishing probable cause for the criminal complaint and search warrant applications, I have not included each and every fact in this investigation known to me and to other investigators. This affidavit is based upon my personal knowledge, information provided to me by other law enforcement agents, my review of subpoenaed records, interviews of witnesses, and my training and experience, among other things.

3.     Since approximately September 2016, the USPIS, including your affiant—together with the Illinois Securities Department and the U.S. Department of Labor-Employee Benefits Security Administration—have been involved in the investigation of RICHARD K. BOOY and his companies, SAFE FINANCIAL STRATEGIES, LLC, and PRINCIPAL FINANCIAL STRATEGIES, LLC. This affidavit is made for the limited purpose of establishing probable cause to support:

(A)     a criminal complaint to be issued in the Northern District of Illinois alleging that, from in or about June 2014 and continuing through in or about December 2016, RICHARD K. BOOY engaged in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts, and, for the purpose of executing the scheme, used and caused the use of a commercial interstate carrier, in violation of Title 18, United States Code, Section 1341 (mail fraud);

(B)     an application for the issuance of a search warrant in the Northern District of Illinois to Comcast, headquartered at 650 Centerton Road, Moorestown, New Jersey 08057, to search BOOY's email account, rkb80@comcast.net, (the "**Subject Email Account**"), for evidence of violations of Title 18, United States Code, Section 1341; and

(C)     an application for the issuance of a search warrant in the Northern District of Illinois to search a forensic digital image of BOOY's hard drive computer—which was originally acquired through judicial process by a

plaintiff on or about September 27, 2016, in a pending civil action against BOOY (16-CV-9106, N.D. Illinois)-and of which the government obtained an additional digital imaged copy on or about November 21, 2016, on a navy blue UnitedLex brand hard drive bearing serial number ULX500- 0001324 (the "**Subject Hard Drive**"), for evidence of violations of Title 18, United States Code, Section 1341.

4.     As discussed below, there is probable cause to believe that BOOY has engaged in a scheme to defraud his victims—most of whom are elderly and some of whom have presently lost their life savings—through false statements and misrepresentations about BOOY's investments of his victims' funds.  Specifically, there is probable cause to believe BOOY made multiple materially false and fraudulent representations and promises in order to defraud his victims, including but not limited to the following:

- that the funds of BOOY's victims would be invested in no-risk investments with a guaranteed rate of return, when at least a significant portion of the funds were misappropriated by BOOY for his own benefit and for other purposes, including making Ponzi-type payments to certain other investors;

- that BOOY would invest his victims' funds with "Principal Financial Group," (which, as described below, is a long-standing and widely-known financial services firm under the umbrella of "Principal Financial Services, Inc.," based in Des Moines, Iowa) and that BOOY was duly affiliated with the "Principal Financial Group," when, in fact, the actual Principal Financial Group entity had no relationship with BOOY, and BOOY neither invested his victims' funds with that firm nor was BOOY authorized to do so; and

- that victims' investments were profitable, when evidence gathered to date indicates that investors' funds were not invested as represented by BOOY and at least some repayment of funds were Ponzi-type payments.

3

5.     Although the investigation continues, there is probable cause to believe that BOOY has defrauded at least fifteen victims of at least approximately $1 million.

## I.     BACKGROUND OF BOOY AND HIS COMPANIES

6.     According to Illinois Department of Insurance records, BOOY was licensed in February 1994 as an insurance producer, authorized to sell insurance in Illinois, but BOOY's license expired on or about February 24, 2012, and was not renewed.

7.     Illinois Secretary of State records show that Safe Financial Strategies, Inc., was registered in the State of Illinois as an LLC on or about June 16, 2008, and was involuntarily dissolved on or about December 11, 2015.  The registered agent and registered address for Safe Financial Strategies, Inc., are Jennifer Lamell Goldstone, 321 N. Clark Street, Suite 800, Chicago, Illinois.  Illinois Secretary of State records for Safe Financial Strategies, Inc., also show that BOOY is the LLC manager at 1120 Ashbury Lane, Libertyville, Illinois, which is also the listed principal office address.

8.     Illinois Secretary of State records show that Principal Financial Strategies, LLC, was registered in the State of Illinois as an LLC on or about August 3, 2016, and remains active.  BOOY is listed as the registered agent and LLC manager for Principal Financial Strategies, LLC.  Illinois Secretary of State records also show that 2086 Broadmoor Lane, Vernon Hills, Illinois, is the registered agent address, LLC manager address, and the principal office for Principal Financial Strategies, LLC.

9.     According to records obtained from Vernon Hills Bank and Trust, BOOY opened a business checking account on or about June 19, 2008, in the name of Safe Financial Strategies LLC (account x6247).    This account was closed as of approximately September 30, 2016.  BOOY was the sole signatory for account x6247. The accountholder contact information that BOOY provided the bank for account x6247 includes BOOY's **Subject Email Account**.

10.     According to records obtained from Vernon Hills Bank and Trust, BOOY opened a business checking account on or about August 23, 2016, in the name of Principal Financial Strategies, LLC (account x0453).   This account was closed on September 12, 2016.  BOOY was the sole signatory for account x0453.

11.     According to PNC Bank records obtained in this investigation, on or about September 9, 2016, BOOY opened a business checking account, in the name of Principal Financial Strategies LLC (account x4688).  BOOY is the sole signatory on the x4688 account.

12.     According to records obtained from JPMorgan Chase Bank, on or about October 1, 2013, BOOY opened a joint personal checking account with Kimberly C. Booy in their names (account x1673).  BOOY is a signatory for account x1673 along with Kimberly C. Booy.

13.     Some of the individuals interviewed in this investigation indicated they received investment-related assistance throughout the past from BOOY.   For instance, on or about December 14, 2016, D.S. of Antioch, Illinois, a stay-at-home mother and daughter of E.H. (who died in March 2016), told investigators that D.S.

is familiar with BOOY as the owner of Safe Financial Strategies, LLC. D.S. said she considered BOOY a friend whom D.S. has known since BOOY came to E.H.'s home over nine years ago selling life insurance and annuities, which E.H. purchased from BOOY.

14. According to publicly available information on the internet, Safe Financial Strategies, LLC, describes itself as "specializ[ing] in Investment Advice," as per www.dandb.com, for example. Also, on December 17, 2016, I reviewed the website for a Christian radio station, "am1160- Hope For Your Life" (http://www.1160hope.com/Advertisers), and on that site, I observed multiple listed advertisers. One of the listed parties for "Investment" that I observed was BOOY's "Safe Financial Strategies" along with BOOY's contact information, including BOOY's email address for the **Subject Email Account**.

## II. BOOY'S USE OF AN INTERSTATE CARRIER TO DEFRAUD VICTIMS

15. The investigation has revealed that BOOY defrauded multiple victims, and communicated with those victims through in-person meetings, email using the **Subject Email Account**, text messages, phone calls, and correspondence delivered via FedEx.[1] The investigation has also revealed that BOOY spent, or otherwise transferred, the proceeds BOOY obtained from his scheme through different financial transactions, including but not limited to, checks, cash withdrawals, and wire

---

[1]    I know from my training and experience, as well as from publicly available records and information, that FedEx is a commercial carrier company headquartered in Memphis, Tennessee, which specializes in the shipping throughout the United States and the world of packages, parcels, and freight via interstate and intrastate delivery.

6

transfers. The information described below is a non-exhaustive summary of BOOY's conduct involving only some, but not all, of the victims of BOOY's that have been presently identified by investigators.

### A. **BOOY and Victim R.O.**

16.     On or about November 21, 2016, Victim R.O. of North Webster, Indiana, was interviewed by investigators. According to Victim R.O., Victim R.O. met with BOOY at Victim R.O.'s daughter's home in Indiana in summer 2015 to discuss investing Victim R.O.'s money. In summary, BOOY told Victim R.O. that:

- BOOY would do a "no risk" investment in private funds where Victim R.O. would receive a guaranteed 5% rate of return and a $2,500 signing bonus; and

- BOOY assured Victim R.O. that Victim R.O.'s investment was safe with no possibility of losing it.

Victim R.O. told investigators that he wrote a personal check in the amount of $80,000 and handed it directly to BOOY. Also, BOOY's bank records show that BOOY deposited an $80,000 check from Victim R.O. into BOOY's x6247 account on August 4, 2015. Victim R.O. said that in return BOOY handed Victim R.O. a deposit receipt, which, according to the copy provided to investigators, states that Victim R.O.'s $80,000 deposit has been "received" for "the term of one (1) year, renewable. All deposits will earn a fixed rate of 5 percent per year" and that Victim R.O. will have an "option window of THIRTY (30) days to renew or take proceeds at end of term."

17.     According to Victim R.O., approximately two months later (October 2015), Victim R.O. decided to invest $20,000 more with BOOY under the same terms as his initial $80,000 investment. For the second investment, Victim R.O. said that

BOOY directed Victim R.O. to send his check to BOOY using FedEx, which Victim R.O. did as instructed. Copies of Victim R.O.'s records from BOOY (which Victim R.O. provided to investigators) include: a FedEx airbill dated October 21, 2015 from BOOY in Illinois to Victim R.O. in North Webster, Indiana (FedEx tracking number 807583082246); an undated prepaid FedEx envelope from Victim R.O. in Indiana to BOOY at 2086 Broadmoor Ln, Vernon Hills, Illinois (FedEx tracking number 807583082371); and a copy of BOOY's typed instructions, which read, "Please make check out to: <u>Safe Financial Services</u> Amount = $20,000.00 Please put check in provided return envelope, and drop in any FedEx box."

18. Victim R.O. told investigators that Victim R.O. "gave BOOY all the money he had in the world [$100,000] and that the only reason he did that was because BOOY reassured him that there [were] no risks involved with this investment." However, according to a review of BOOY's account x6247,[2] there is no indication that BOOY invested any of R.O.'s money. On August 4, 2015, when BOOY deposited Victim R.O.'s $80,000 check, BOOY's account had a balance of $5,311.10. Bank records show that, from on or about August 4, 2015, through on or about October 23, 2015, BOOY's account received no other deposits, and that by on or about October 23, 2015, BOOY's account had a negative balance. An analysis of BOOY's banking activities reveals that BOOY used Victim R.O.'s $80,000 for cash withdrawals, and for multiple checks payable to BOOY and other parties, including

---

[2] As discussed above, on or about June 19, 2008, BOOY opened the Safe Financial Strategies, LLC, account x6247 at Vernon Hills Bank and Trust.

payments to such parties as "The Maids," "Libertyville Gymnastics Academy," "Best Buy," and "BCBS Health" Insurance. BOOY's account records further show that, after BOOY's account eventually went into negative balance by on or about October 23, 2015, BOOY then deposited victim R.O.'s second check for $20,000 on or about October 26, 2015, which BOOY then spent through more cash withdrawals, checks to himself, and additional payments to parties such as "ATT," "Comcast," "Best Buy" and "BCBS Health" Insurance, and multiple apparent credit card payments. BOOY's account records show that, by on or about November 12, 2015, BOOY depleted Victim R.O.'s entire $20,000 investment.

19. Victim R.O. told agents that, to date, Victim R.O. has not received any of his money back from BOOY and that Victim R.O. never gave BOOY permission to use any portion of Victim R.O.'s money for BOOY's personal use.

**B. BOOY and Victims D.S. and E.H.**

20. Victim D.S. (who, as described above, met with investigators on or about December 14, 2016) told investigators that her now-deceased mother, Victim E.H., was satisfied with BOOY's previous work to obtain life insurance and an annuity with ING for Victim E.H. According to Victim D.S., BOOY approached Victim D.S. and Victim E.H. in June 2014 about an investment that BOOY described as safe and risk-free that generated five percent annual interest. Victim D.S. told investigators that BOOY said this risk-free investment was a one-year Certificate of Deposit (CD) issued by "Principal Financial Group" and that BOOY pooled other investors' money in order to make it a larger CD, which guaranteed the five percent interest annual return.

21.     Victim D.S. said that, in response to BOOY's pitch, on or about June 4, 2014, Victim E.H. and Victim D.S. agreed to invest and provided $194,230 of Victim E.H.'s money to BOOY for the CD investment. BOOY provided Victim E.H. with a "Principal Bank: Certificate of Deposit" dated June 4, 2014, with the name (and apparent logo) of the "Principal Financial Group."[3] That certificate, a copy of which Victim D.S. provided to investigators, also states the "term of deposit" is one year with a "5%" interest rate and that:

> This is to certify that the holder of this certificate whose particulars appear hereunder is a depositor with Principal Bank through Safe Financial Strategies, LLC and has the right and privilege of ownership according to the provisions of the Depository.

BOOY subsequently provided Victim D.S. and Victim E.H. with an "Annual Statement" also bearing the name (and apparent logo) of the "Principal Financial Group," which indicated that as of one year later, on or about June 4, 2015, the account value increased to $203,941.50.

22.     Subsequently, BOOY convinced Victim E.H. and Victim D.S. to provide more money. Victim D.S. told investigators that, after it was necessary to cash out Victim E.H.'s life insurance policy in December 2015 to help cover Victim E.H.'s living

---

[3]     I know from my investigation, which includes information I obtained by Principal Financial Services, Inc., that there is no indication that BOOY had an authorized business affiliation or relationship with Principal Financial Services, Inc., including any of the entities under the umbrella of Principal Financial Services, Inc., such as "Principal Financial Group." I also know from my review of BOOY's bank transactions, as well as from information obtained from Principal Financial Services, Inc., that there is no indication that BOOY placed victim investment money into actual accounts with Principal Financial Services, Inc., including "Principal Financial Group."

expenses, BOOY specifically convinced Victim D.S. to invest an additional $50,000, which Victim D.S. did using some of those life insurance policy funds. Victim D.S. provided investigators with bank records from her account at State Bank of the Lakes for an account that Victim D.S. held jointly with Victim E.H. Victim D.S.'s bank records show that D.S. wrote a check for $50,000.00 on or about February 15, 2016, to "Safe Financial Strategies," which, according to the corresponding deposit ticket, was deposited on or about February 16, 2016, in BOOY's account x6247 with a stamped endorsement, "SAFE FINANCIAL STRATEGIES, LLC, 1120 Ashbury Ln, Libertyville, IL 60048."

23. Bank records for account x6247 show that, when BOOY deposited Victim D.S.'s $50,000 check on or about February 16, 2016, account x6247 was incurring overdraft charges and had a negative balance (approximately -$89.18). An analysis of account x6247 reveals no indication that Victim D.S.'s $50,000 was invested by BOOY, and instead, BOOY depleted the $50,000 almost completely by March 3, 2016, when the account had a balance of approximately $330.95. Between on or about February 16, 2016 (the date the $50,000 was deposited), and on or about March 3, 2016, the only deposit into account x6247 was Victim D.S.'s $50,000 check, which BOOY spent on, among other things, payments to Best Buy, DirectTV, credit cards, checks payable to BOOY and at least one check for $3,500 to "Kimberly Booy," as well as multiple cash withdrawals (including $5,000 and $5,500, both on February 19, 2016).

11

24.     According to Victim D.S., her husband, K.S., was not comfortable with the additional $50,000 investment, so K.S. contacted Principal Financial Group (which your affiant understands to be the actual company headquartered in Des Moines, Iowa) in March 2016. According to K.S. and Victim D.S., Principal Financial Group was not able to find an account in Victim E.H.'s name or to provide any information about a CD. Victim D.S. told investigators that she immediately called BOOY to get the $50,000 back, and Victim D.S. said BOOY provided D.S.'s money back in March 2016. According to bank records for account x6247, BOOY withdrew $50,000 on or about March 25, 2016, in cash. However, as discussed above, Victim D.S.'s $50,000 was depleted to approximately $330.95 by on or about March 3, 2016. Moreover, bank records for account x6247 show that BOOY subsequently deposited only three items in the time period between on or about March 3, 2016, and BOOY's March 25, 2016 withdrawal of $50,000: (1) on or about March 7, 2016, BOOY deposited a $20,000 check from Victim D.W.; (2) on or about March 14, 2016, BOOY deposited another check from Victim D.W. for $31,000; and (3) on or about March 23, 2016, BOOY deposited a check from Victim D.W. for $66,000. As discussed below, D.W. is another victim of BOOY's scheme. Accordingly, BOOY's bank records show that BOOY refunded Victim D.S. $50,000 that was comprised largely, if not entirely, of at least one other victim's money, a form of Ponzi payment.

25.     Victim D.S. told investigators that sometime in summer 2016, BOOY told Victim D.S. that it will take some time for Victim D.S.'s mother to get her money back (i.e., Victim E.H.'s initial June 2014 investment of $194,230.00) and that it

would come to BOOY first. According to D.S., BOOY told Victim D.S. that the money would come in little chunks at a time.

## C.     **BOOY and Victim D.W.**

26.     Victim D.W., whose March 2016 checks were used by BOOY to refund $50,000 to Victim D.S., was interviewed by investigators on or about November 23, 2016. Victim D.W. told investigators he retired four years ago after 35 years as a federal employee. Victim D.W. also said that, after entering a research query on the internet for an IRA, Victim D.W. was contacted on the phone by a woman who gathered more information about Victim D.W., which was followed one week later by a meeting with BOOY at Victim D.W.'s house in Aurora, Illinois. In general summary, according to Victim D.W., BOOY said and did the following:

- told Victim D.W. that Victim D.W. would receive a $10,000 bonus if Victim D.W. invested $100,000;

- told Victim D.W. that BOOY's company, "Safe Financial," invested in other companies which paid 10% interest from which BOOY would pay Victim D.W. five percent interest;

- told Victim D.W. that BOOY was the owner of Safe Financial, which was affiliated with "Principal Financial"; and

- that BOOY showed Victim D.W. copies of checks from other purported investors.

27.     Victim D.W. told investigators that he first invested $20,000, and gave a check to BOOY at Victim D.W.'s house on March 7, 2016, which was followed by two subsequent checks ($31,000 and $66,000), each of which Victim D.W. gave to BOOY when BOOY returned to Victim D.W.'s house. Among the records Victim D.W. received from BOOY (copies of which Victim D.W. provided to investigators) is a

13

"contract statement" with the "Principal Financial Group" name and a purported logo and that also indicates the "value of [Victim D.W.'s] contract" is $117,000 as of March 27, 2016, with a supposed "bonus value" of "$128,700" and five percent interest rate.

28.     Victim D.W. told investigators that he became concerned within days of giving BOOY his final $66,000 investment check in late March 2016, so Victim D.W. contacted Principal Financial, referring to the actual Iowa-based financial firm. According to Victim D.W., Principal Financial informed D.W. that his name was not in their database, which then prompted Victim D.W. to demand a refund from BOOY and to threaten BOOY with legal action.  Victim D.W. said that BOOY responded that he would not be able to give Victim D.W. his money in a lump sum until April or May 2016 because, according to BOOY, Victim D.W.'s money was invested in different things.  Victim D.W. eventually received refund payments totaling $117,000 from BOOY, which Victim D.W. received through FedEx delivery because, according to D.W., BOOY told Victim D.W previously that BOOY did not want to send or receive anything via United States Mail Service.  Specifically, Victim D.W. provided investigators with a copy of a FedEx airbill dated on or about June 17, 2016, from BOOY, "1120 Ashbury Lane, Libertyville, Illinois," to Victim D.W.'s address in Aurora, Illinois, from an envelope which contained documents provided by BOOY. BOOY's bank records reveal that a portion of the $117,000 that BOOY paid back to

Victim D.W. was a form of Ponzi-type payment funded by at least three other victims of BOOY's scheme.[4]

### D.    BOOY and Victim C.S. and C.S.'s Church (Victim Church)

29.    On or about November 2, 2016, Victim C.S., a pastor in Chicago, Illinois, was interviewed by investigators about BOOY. Victim C.S. said that BOOY presented Victim C.S. in 2016 with a "no risk" investment with a guaranteed rate of return of 4%, which could be higher if the investment performed well. Victim C.S. said that BOOY told Victim C.S. that the money would be invested with Principal Financial, which is based in Des Moines, Iowa, and then placed into a collection of CDs. Victim C.S. said that his church's board agreed to invest $20,000 in April 2016, which was given to BOOY by check at the church. According to bank records for the x6247 account, BOOY deposited a $20,000 check on or about April 28, 2016, from the Victim Church. A review of BOOY's bank account shows that BOOY withdrew

---

[4]    Specifically, according to records for BOOY's x6247 account in the name of Safe Financial Strategies, LLC, the balance on or about July, 6, 2016, was approximately $1,130.41. Thereafter, BOOY deposited four checks from Victims I.P., J.S., and M.M. into the x6247 account: checks from Victim I.P. for $20,000 and $5,000, respectively, which posted on or about July 11, 2016; a check for $50,000 from victim J.S. that posted on or about July 12, 2016; and a check from Victim M.M. for $10,000 that posted on or about July 13, 2016. A further review of the bank records showed that BOOY used some of the money received from Victims I.P., J.S., and M.M. to pay back a purported refund to Victim D.W. Account records show that, on or about July 15, 2016, BOOY made check #1509 payable to "Cash," which BOOY used to obtain a cashier's check for $66,000 that, in turn, BOOY made payable to Victim D.W. Based upon a review of the activity in BOOY's account x6247, there were no other deposits between on or about July 6, 2016, and on or about July 15, 2016, other than deposits from Victims I.P., J.S., and M.M., to account for the funding of the $66,000 "refund" to Victim D.W.

15

$10,500 in cash on or about May 2, 2016, and thereafter spent the remainder of the Victim Church's money on bills, and payments to himself and to others.

30. Victim C.S. said that, in June 2016, Victim C.S. decided to invest $25,000 of his own money and did so via two different checks to BOOY, each of which Victim C.S. gave in person to BOOY at the Victim Church. According to Victim C.S., BOOY provided Victim C.S. with documents after receiving each payment, and BOOY told Victim C.S. that Victim C.S. could withdraw Victim C.S.'s investment money at any time. As discussed below, an analysis of account x6247 reveals no indication that Victim C.S.'s $25,000 was invested by BOOY. Specifically, according to bank records for the x6247 account:

- BOOY first deposited a $21,000 check from Victim C.S. on or about June 8, 2016, which is the same date on which BOOY deposited a $17,000 check from another victim (Victim M.C., who is discussed below);

- As a result of BOOY's deposit of $38,000 in total from Victims C.S. and M.C., x6247 account records show that BOOY's balance increased from approximately $4,432.11 to approximately $42,432.11 by on or about June 8, 2016;

- Account records also show that, on or about June 10, 2016, BOOY withdrew $300 in cash; deposited $1,000 from the x6247 account into BOOY's personal Chase account x1673; and paid $1,000 toward a "Citi Card Online" payment, all of which reduced the x6247 account balance to approximately $40,132.11 by on or about June 10, 2016;

- Records for x6247 account show that next, on or about June 14, 2016, BOOY deposited $50,000 into the x6247 account from yet another victim (Victim I.P., who is discussed below), and then BOOY deposited an additional $50,000 from Victim I.P. on or about June 15, 2016. Records for the x6247 account show that BOOY paid $20 on June 16, 2016, for an apparent bank maintenance fee; and

- As a result of the combined $138,000 that BOOY deposited from Victims C.S., M.C., and I.P., between on or about June 8, 2016, through on or

about June 15, 2016, bank account records show that the resulting balance in the x6247 account was approximately $140,112.11.

31.     Records for the x6247 account show that—as of on or about June 16, 2016, when BOOY's account had a $140,112.11 balance ($138,000 of which was comprised of funds from Victims C.S., M.C., and I.P.)—BOOY then executed the following transactions from x6247 account using those victim funds:

- On or about June 16, 2016, account records show that BOOY wired approximately $64,026.55 from his x6247 account at Vernon Hills Bank to "Attorney's Title Guaranty Fund, Receiver Name: BMO Harris Bank, Purpose: Closing on Home";

- On or about June 17, 2016, account records show that BOOY withdrew approximately $61,963.04 in cash

- Between on or about June 17, 2016, and on or about June 22, 2016, BOOY made multiple payments, including to himself and other parties; and

- Bank account records show that, by on or about June 22, 2016, the balance in x6247 account was reduced to approximately $6,542.24.

32.     According to x6247 bank account records, Victim's C.S.'s second investment check in the amount of $4,000 was deposited by BOOY on or about June 27, 2016, leaving the x6247 account with an approximate balance of $10,542.24. A review of BOOY's bank account then shows that the next day (on or about June 28, 2016) after BOOY deposited Victim C.S.'s $4,000 check, BOOY wrote a check to himself for $3,500 (which Chase Bank records show BOOY deposited into his personal Chase account x1673) and BOOY paid a Citi Card payment for $500 on or about June 30, 2016.

33.     Victim C.S. told investigators that in mid-September Victim C.S. asked BOOY to return $10,000 of Victim C.S.'s personal investment, but that (as of

17

November 2, 2016), Victim C.S. has not received his money, despite BOOY's previous representation to Victim C.S. that Victim C.S.'s money could be withdrawn at any time.

### E.     BOOY and Victim I.P.

34.     On or about September 19, 2016, investigators interviewed Victim I.P., age 84, at Victim I.P.'s residence in Chicago, Illinois.  Victim I.P. told investigators that she met BOOY through a friend at Victim I.P.'s church, and that BOOY told Victim I.P. that he was a financial advisor, a member of Safe Financial Strategies, and a registered agent for Principal Financial Group.  According to Victim I.P., she met with BOOY at church to discuss investing, and BOOY assured Victim I.P. that her principal and her returns would be secured and guaranteed.  Because BOOY told Victim I.P. there was no risk involved with her investment, Victim I.P. decided to invest and gave BOOY $50,000 on June 13, 2016, and another for $50,000 on June 15, 2016.  According to BOOY's bank records for his x6247 account, BOOY deposited $100,000 from Victim I.P. between a deposit on June 14, 2016, and another deposit on June 15, 2016.  However, as discussed above concerning Victim C.S., a review of bank records provides no indication that BOOY invested Victim I.P.'s $100,000. Rather, as discussed above, the x6247 account records show Victim I.P.'s $100,000 investment (deposited by BOOY on June 14-15, 2016) was then used by BOOY to fund, in part:  (a) BOOY's June 16, 2016 wire transfer in the approximate amount of $64,026.55 (for "closing on home"); and (b) BOOY's June 17, 2016 cash withdrawal of approximately $61,963.04, among other payments by BOOY to himself and others.

18

35.     According to Victim I.P., BOOY provided Victim I.P. with documents concerning her transactions, which included BOOY's business card (a copy of which Victim I.P. gave to investigators) and which reads as follow:

> SAFE FINANCIAL STRATEGIES
> Not low risk. NO Risk.
> Richard K. Booy
> Member
> 1120 Ashbury Lane
> Libertyville, IL  60048
> (224) 206-8617
> (224) 206-8605 Fax
> rkb80@comcast.net [the **Subject Email Account**]
> www.promoneyreports.com/rb1

36.     Victim I.P. told investigators that she subsequently invested another $25,000, which BOOY's bank account records show BOOY deposited on or about July 11, 2016.  Victim I.P. also said that she requested her $25,000 back from BOOY, which BOOY did eventually return to Victim I.P., but that BOOY had failed to pay her the rest of her money despite BOOY's claim to Victim I.P. that he would do so as soon as the bank cleared it.  Victim I.P. told investigators that Victim I.P.'s sister, M.M., also invested money with BOOY.

## F.     **BOOY and A.P.**

37.     According to an email message from A.P., who communicated with BOOY about a potential $100,000 investment, BOOY sent A.P. the following email message on or about July 29, 2016, from the **Subject Email Account**:

> Please        check        out        this        link: https://en.wikipedia.org/wiki/Principal_Financial_Group[.]  It is the Wikipedia information about Principal.  They have been in business for over 100 years, and almost a half TRILLION dollars in assets.  I am planning on seeing you

this Monday at 1:30 in the lobby of your building. Thank you- Richard Booy (224) 206-8617[.]

Next, according to a copy of an August 4, 2016 email message to A.P. from BOOY's

**Subject Email Account**, BOOY stated as follows:

> When we last spoke. you indicated that you were interested in the plan I showed you, wanted to get started, but just needed some time to find out more about Principal Financial. You should have no trouble getting lots of information on the insurance giant. Plus, I sent you the Wikipedia link as well. I would like to set our next appointment, so please give me an idea of when you would be available, and I will meet you in the lobby of your building again. Thank you- Richard Booy (224) 206 – 8617

38.    According to records obtained from A.P., BOOY provided A.P. with a typed investment proposal in which BOOY asserted that, as part of an investment, A.P. "will be paid 5% interest on the money, plus any bonuses . . . which is not dependent on the market doing anything, and is not subject to any kind of risk." BOOY's typed proposal to A.P. further stated, "This is my specialty, and I will ensure that you are matched with the right company[.] that you are very well protected against anything that could jeopardize your nest egg, and that Uncle Sam keeps his hands out of what should go to your heirs."

### G.    **BOOY and Victim M.C.**

39.    On or about December 6, 2016, investigators interviewed Victim M.C., age 69, of Minooka, Illinois. Victim M.C. notified the investigators that: Victim M.C. suffers from Parkinson's disease, Victim M.C.'s husband died earlier this year, and, as a result, Victim M.C. had to sell her home in New Lenox, Illinois, in order to move in with Victim M.C.'s daughter in Minooka, Illinois. Victim M.C. also told investigators that sometime in summer 2016, Victim M.C. received money from one

of her deceased husband's life insurance policies, which Victim M.C. wanted to invest. According to Victim M.C., Victim M.C. searched the internet and came across a website with BOOY's information. Victim M.C. said she filled out a contact form on this website, which Victim M.C. could not recall, and that minutes later, Victim M.C. was contacted by phone by BOOY. Victim M.C. told BOOY that she had $13,000 to invest, and, in response, BOOY told M.C. to invest in CDs, which BOOY described as a 100% safe investment in which M.C.'s investment would be guaranteed with no risk of losing the principal. BOOY also told Victim M.C. that Victim M.C. would receive a 5% return on her investment per year.

40.     Victim M.C. told investigators that BOOY scheduled an appointment to visit Victim M.C., and that a couple days after their phone call, BOOY came to Victim M.C.'s former New Lenox house. According to Victim M.C., during this meeting, BOOY again reassured Victim M.C. that Victim M.C.'s investment was 100% safe and there were no risks involved. Victim M.C. told the agents that BOOY seemed nice to her, so Victim M.C. decided to trust BOOY and handed BOOY a check for $13,000 in her home. In response, BOOY provided Victim M.C. with a receipt (which Victim M.C. can no longer locate). BOOY's bank records for account x6247 show that BOOY deposited M.C.'s $13,000 check on or about April 20, 2016, and that prior to that deposit, BOOY had only approximately $89.17 in the account. Thereafter, BOOY's bank records indicate that BOOY did not invest Victim M.C.'s money, but rather, depleted Victim M.C.'s money down to $3,650.92 by on or about April 27, 2016, through payments to himself and other parties, including Best Buy and DirectTV,

and then replenished his account with the $20,000 investment from the Victim Church (as described above).

41.     Victim M.C. told investigators that, a couple months later, BOOY called her and asked if Victim M.C. wanted to invest more money with BOOY. According to Victim M.C., by this time, Victim M.C. had received a second life insurance check for her deceased husband, so Victim M.C. wrote a check for $17,000 and gave it personally to BOOY at her new home in Minooka, Illinois. Once again, BOOY told Victim M.C. that the terms of her investment were for a 5% rate of return per year with no risk of losing her investment. BOOY's bank records show that BOOY deposited Victim M.C.'s check on June 8, 2016, which was the same day that BOOY also deposited $21,000 from Victim C.S (the church pastor, as described above). BOOY's bank account records show that BOOY's account x6237 had a balance of $4,432.11 before BOOY deposited $38,000 from Victims M.C. and C.S. BOOY's bank records show that BOOY did not invest Victim M.C.'s $17,000 because, as discussed above, BOOY used the combined $138,000 investment funds of Victims M.C., C.S., almost entirely to fund: (a) BOOY's June 16, 2016 wire transfer in the approximate amount of $64,026.55 (for "closing on home"); and (b) BOOY's June 17, 2016 cash withdrawal of approximately $61,963.04, among other payments by BOOY to himself and others parties.

## H.     BOOY and Victim J.S.

42.     On or about December 7, 2016, investigators interviewed Victim J.S., age 74 and a retired painter, at J.S.'s apartment in Berwyn, Illinois. Victim J.S. told

investigators that he kept his life savings in a CD at his local bank, which was getting about a 4% interest rate return. Victim J.S. said that, in July 2016, Victim J.S. did internet research about investing, when Victim J.S. came upon a website advertising a 5% return rate for CDs. Victim J.S. cannot recall if he provided information on-line, but said that a few days later, Victim J.S. received a phone call from BOOY. Then, according to Victim J.S., BOOY went to Victim J.S.'s home on July 7, 2016. According to Victim J.S., BOOY told Victim J.S. that:

- BOOY offered Victim J.S. a 5% return per year on his investment with 0% risk of losing the principal by investing in "group CDs";

- BOOY said that a group CD was when monies from various investors are put together in order to buy a CD with a higher rate of return; and

- BOOY said this method of investing assured Victim J.S. that Victim J.S.'s investment was 100% secured and BOOY also offered J.S. a $2,500 signing bonus.

Victim J.S. told investigators that he handed BOOY a check for $50,000. According to BOOY's bank records for account x6247, BOOY deposited Victim J.S.'s $50,000 check on July 11, 2016, but these account records indicate that BOOY did not invest Victim J.S.'s money.

43. Victim J.S. provided investigators copies of email messages that Victim J.S. exchanged with BOOY and BOOY's **Subject Email Account**, which, in summary, show that Victim J.S. and BOOY exchanged at least four email messages between September 3, 2016, and September 13, 2016, in which BOOY purports to provide financial advice concerning life insurance and annuities.

### I.     BOOY and Victim B.S.

44.     On or about December 6, 2016, Victim B.S. of Greenfield, Wisconsin, was interviewed via telephone by investigators. Victim B.S. said that in August 2016, she received inheritance money and was looking for ways to invest it. Victim B.S. also told investigators that she was searching the internet and came across a webpage involving annuities. A couple days later, Victim B.S. received a call from BOOY, who claimed to be a financial advisor. According to Victim B.S., during her phone conversation with BOOY, they discussed investing in annuities and CDs, and BOOY made an appointment to meet with Victim B.S.

45.     Victim B.S. told investigators that, on August 25, 2016, BOOY came to Victim B.S.'s house in Wisconsin and discussed investment options. Victim B.S. said that BOOY claimed to be a representative of "Principal Financial Group" and that BOOY advised Victim B.S. to invest her money in a type of CD that would yield a 5% return on investment with no risk of losing the principal. According to Victim B.S., after listening to BOOY's explanation, Victim B.S. decided to follow BOOY's advice, wrote a check for $125,000, and gave it in person to BOOY. Among the documents that Victim B.S. received from BOOY was a contract on "Principal Financial" letterhead.

46.     As discussed above, on or about August 23, 2016, BOOY opened the Principal Financial Strategies, LLC, account x0453 at Vernon Hills Bank and Trust. Bank records show that the same day—on or about August 23, 2016—BOOY deposited the $125,000 check from Victim B.S. The bank records for account x0453

show that this account remained open through on or about September 30, 2016, and that the only deposit into this account was Victim B.S.'s check for $125,000 (aside from $868.38 deposited in cash on or about September 12, 2016). An analysis of BOOY's account x0453 indicates that Victim B.S.'s $125,000 was not invested by BOOY, but instead, BOOY used Victim B.S.'s money as follows:

- On or about September 8, 2016, BOOY withdrew $84,100.00 in cash;

- On or about September 8, 2016, BOOY transferred $15,243.03 to his Safe Financial Strategies account x6247;

- Between or about September 8, 2016, and on or about September 12, 2016, BOOY caused multiple "preauthorized debits" to such recipients as DirectTV, Comcast Cable, ComEd, and ATT;

- On or about September 9, 2016, BOOY wrote a check in the amount of $11,377.72 for "2086 Broadmoor – Aug and Sep"; and

- On or about September 12, 2016, BOOY wrote a check to himself for $6,000 that BOOY deposited into his personal Chase account x1673.

According to bank records, BOOY's account x0453 closed as of September 30, 2016, with a zero balance.

47. Victim B.S. told investigators that a couple of months after her investment, Victim B.S. made an appointment to meet with BOOY in order to invest more money. Victim B.S. told investigators that BOOY came to B.S.'s work place in Wisconsin, and Victim B.S. wrote BOOY a check for $20,000. According to Victim B.S., Victim B.S. gave BOOY this additional money with the purpose of investing it in a CD with a 5% return per year and no risk. Victim B.S. said BOOY provided her with a handwritten receipt. Bank records for BOOY's PNC Bank account x4688, show that B.S.'s $20,000 was deposited into account x4688 on or about September 15, 2016.

**J.** **BOOY and K.H. and Victim M.S.**

48.     On or about November 7, 2016, investigators interviewed K.H. of Granger, Indiana. K.H. said that her mother, Victim M.S., died in July 2016, and that K.H. believed her late mother met BOOY thirteen years ago. K.H. told investigators that BOOY was some sort of financial advisor to K.H.'s parents (which include Victim M.S.). According to K.H., after her mother's death in July 2016, K.H. went through her late mother's records and discovered several certificates from BOOY for approximately $130,000. K.H. then contacted BOOY to discuss, and, according to K.H.:

- BOOY confirmed the terms of the late Victim M.S.'s investments as "no risk" investments with a 5% interest per year and no tax penalties;

- BOOY told K.H. that the late Victim M.S.'s investments were in private funds in India and that it would take six to nine months to get the money back from India; and

- BOOY assured K.H. that BOOY would mail K.H. a check as soon as the funds were available, and BOOY instructed K.H. to mail BOOY a copy of the death certificate (which K.H. said that she sent via express mail from Indiana to BOOY and which K.H. also emailed to BOOY's **Subject Email Account** on August 4, 2016).

49.     According to K.H.'s records, which K.H. provided to investigators, K.H. emailed BOOY's **Subject Email Account** on September 14, 2016, and wrote:

I am checking in with you to see if you have any status on my mom's funds. I realize that you said it would not be a quick process but I don't know what "quick" means in this situation; 1 month, 3 months, 6 months? Thanks for any information you can share with me.

K.H.'s records show that, on September 14, 2016, BOOY responded using his **Subject Email Account**, and wrote, "I'll check to see if there are any updates and [will] contact your cell tomorrow morning."

### III. PRINCIPAL'S SEPTEMBER 2016 LAWSUIT; COURT'S SEPTEMBER 2016 TEMPORARY RESTRAINING ORDER AND OCTOBER 19, 2016 INJUNCTION

50. According to publicly available records, and information I obtained in this investigation, I know that Principal Financial Services, Inc., is a corporation registered and based in Des Moines, Iowa, and is a subsidiary of the Principal Financial Group, Inc. As discussed above, multiple victims have provided investigators with copies of records they received from BOOY, which I have reviewed, and which I have observed contain logos and references that have the appearance of the actual "Principal Financial Group."

51. On September 21, 2016, Principal Financial Services, Inc., filed a civil action against BOOY and BOOY's company, Safe Financial Strategies LLC in the Northern District of Illinois, which is pending before Judge Jorge L. Alonso (16-CV-9105). I have reviewed the docket and various pleadings filed in 16-CV-9105. Among other things, according to Principal Financial Services, Inc.'s complaint (Doc. 6), Principal Financial Services, Inc., sought injunctive and monetary relief for BOOY's alleged acts of trademark infringement, unfair competition, trademark dilution, trademark counterfeiting, and deceptive trade practices under the Lanham Act, Title 15 U.S.C. § 1051, *et seq*.[5]

---

[5] As stated previously, I know from my investigation, which includes information I obtained by Principal Financial Services, Inc., that there is no indication that BOOY

52.    On September 21, 2016, Principal Financial Services, Inc., concurrently filed an *ex parte* application for a temporary restraining order and a seizure order ("TRO") to obtain certain types of evidence from BOOY (including computers, business records, *etc.*) (16-CV-9105, Doc. 14) pursuant to 15 U.S.C. § 1116(d).  After an emergency *ex parte* hearing on September 23, 2016, the court granted Principal Financial Services, Inc.'s TRO application (Doc. 19, 21).  Then, on or about September 27, 2016, pursuant to the court's TRO (Doc. 23; filed September 23, 2016), Principal Financial Services, Inc., together with the judicially authorized assistance of the U.S. Marshal Service, obtained evidence from BOOY's residence at 2086 Broadmoor Lane in Vernon Hills, Illinois.  Moreover, according to J.N.—an attorney for Principal Financial Services, Inc., whom I interviewed on December 16, 2016—the individuals on scene on or about September 27, 2016, to execute and enforce the court's TRO, located BOOY's computer at BOOY's residence at 2086 Broadmoor Lane in Vernon Hills, Illinois.  According to J.N., Principal Financial Services, Inc., obtained a digital imaged copy of BOOY's computer and also recovered other evidence, including printed records.

---

had an authorized business affiliation or relationship with Principal Financial Services, Inc., including any of the entities under the umbrella of Principal Financial Services, Inc., such as "Principal Financial Group."  I also know from my review of BOOY's bank transactions, as well as from information obtained from Principal Financial Services, Inc., that there is no indication that BOOY placed victim investment money into actual accounts with Principal Financial Services, Inc., including "Principal Financial Group."

53. J.N. also said that J.N. was present at 2086 Broadmoor Lane in Vernon Hills, Illinois, on or about September 27, 2016, to assist in the execution of the TRO. There, J.N. observed a deputy United States Marshal serve paperwork upon BOOY, (which included a copy of the TRO). J.N. thereafter observed BOOY review the stack of papers served by the U.S. Marshal Service. The filed return of service shows that the U.S. Marshal Service personally served BOOY with a copy of the court's TRO (Doc. 29). Among other things, the court's TRO (Doc. 23) enjoined BOOY and BOOY's companies from, in summary:

- using the various names and marks (or colorable imitations thereof) of Principal Financial Services, Inc., in connection with the sale and distribution of non-genuine financial products of Principal Financial Services, Inc.;

- accepting funds from anyone who desires to invest in a product of Principal Financial Services, Inc.;

- making false or misleading statements regarding Principal Financial Services, Inc., or its products (or the relationship between it and BOOY); or

- "spending, transferring, moving or otherwise depleting any funds obtained from investors via Defendants' counterfeiting activities."

54. On or about November 21, 2016, the government received from Principal Financial Services, Inc., an additional copy of the imaged hard drive (namely, the **"Subject Hard Drive"**) that was extracted by Principal Financial Services, Inc., from BOOY's residence on or about September 27, 2016, per the court's TRO. The government has not searched the **Subject Hard Drive**.

55. On or about December 19, 2016, I spoke again with J.N., an attorney for Principal Financial Services, Inc., who assisted in obtaining items at BOOY's

residence on or about September 27, 2016, pursuant to the court's TRO. Among other things, J.N. told me the following:

- After BOOY was informed of the purpose of J.N.'s visit (which included the U.S. Marshal services and others), BOOY directed J.N. and others to BOOY's home office, which was located on the first floor of BOOY's residence;

- Within that home office, J.N. observed, among other things, a desk with a desktop computer, various records located on the desk next to the computer, records on the floor by the desk, and records in boxes adjacent to the desk with the computer;

- J.N. asked BOOY if BOOY maintained business records anywhere else in the home, and BOOY responded that BOOY did not;

- J.N. asked BOOY if BOOY had any other computers that contained business records, and BOOY said that BOOY did not;

- The paper records that J.N. observed near BOOY's computer included, but were not limited to: copies of printed email messages, which included the **Subject Email Account**; spreadsheets that contained names, addresses, and phone numbers; copies of FedEx airbills that appeared to be delivered receipt copies, notes concerning apparent prospective and existing clients; records containing the terms "Safe Financial Strategies" and "Principal Financial Group"; copies of certificates of deposit that purported to indicate various parties' investment amounts and interest rates; copies of cancelled checks made payable to "Safe Financial Strategies"; and

- J.N. also observed a document that appeared to be an application for a financial product such as insurance or an investment. J.N. further observed that, taped to the top of that application, was the actual name and actual logo of J.N.'s client, "Principal Financial Group."

56. On December 16, 2016, J.N. also told me that, based upon the records that J.N. and others observed next to BOOY's computer, personnel assisting J.N. took a digital image on the scene of BOOY's computer, and did not seize BOOY's actual computer hard drive. J.N. also said that the digital image that J.N.'s client obtained

was subsequently copied and provided to the government (which is the **Subject Hard Drive**). J.N. also told me that, in non-exhaustive summary, J.N.'s previous observations of BOOY's hard drive (which is the same as the **Subject Hard Drive** provided to the government) showed that BOOY's hard drive contained, among other things, email messages between BOOY and what appeared to be prospective and existing clients; a copy of a certificate of deposit that appears to be the same as the paper records that J.N. observed next to BOOY's computer; an image file of the logo of J.N.'s client ("Principal Financial Group"); as well as statements of account that appear to show various amounts of money that BOOY received with corresponding dates.

## IV. BOOY'S ACTIVITIES FROM OCTOBER 2016 THROUGH DECEMBER 2016

57. As discussed below, the investigation has revealed that—after the TRO, which was personally served on BOOY by the U.S. Marshal Service on or about September 27, 2016 (and which remained in effect through October 19, 2016), and after the October 19, 2016 Preliminary Injunction, to which BOOY stipulated (and which remains in effect to the present)—BOOY has nonetheless continued his fraud scheme.

58. Victim M.C. (who, as described above has Parkinson's and recently moved in with a daughter after Victim M.C.'s husband died earlier this year, and who gave BOOY $13,000 in April 2016 and $17,000 in June 2016) told investigators on or about December 6, 2016, that Victim M.C. is currently in the process of purchasing an insurance policy from BOOY. Victim M.C. said that, because of her medical

condition, Victim M.C. is unsure how long Victim M.C. can reside with her daughter, and so Victim M.C. is seeking an insurance policy to cover nursing home expenses. Victim M.C. also told investigators that she was concerned that BOOY did not previously provide Victim M.C. with a contract or statement, so Victim M.C. contacted BOOY on November 29, 2016. According to Victim M.C., BOOY apologized for not sending a contract and BOOY explained that his mother had apparently been in the hospital. Victim M.C. said that on December 2, 2016, M.C. received via FedEx an envelope from BOOY, which contained a contract on Principal Financial letterhead, purportedly evidencing Victim M.C.'s previous investment. Victim M.C. provided investigators with copies of these records, which include a copy of a FedEx airbill (Tracking Number 807583082430) dated on or about December 1, 2016, from BOOY at 1120 Ashbury Lane in Libertyville, Illinois, to Victim M.C. in Minooka, Illinois. These records also include a "Contract Statement" with "Principal Financial Strategies" and a lighthouse logo (which is different than the previous logos I have seen on other contracts that BOOY gave some victims).

59. Victim B.S. (who, as described above, gave BOOY $125,000 of Victim B.S.'s inheritance money on August 25, 2016, and another $20,000 in September 2016) told investigators on or about December 6, 2016, that Victim B.S. contacted BOOY and asked BOOY to return Victim B.S.'s money. According to Victim B.S., BOOY told Victim B.S. that he would meet with Victim B.S. on December 9, 2016, to discuss the status of Victim B.S.'s investment.

60.     Victim J.S. (who, as described above is a 74-year-old retired painter who gave BOOY $50,000 in July 2016) told investigators on December 7, 2016, that on October 20, 2016, BOOY again visited Victim J.S.'s home in Berwyn, Illinois. (As noted above, one day before this meeting—October 19, 2016—is when the court ordered the injunction against BOOY, as stipulated between BOOY and Principal Financial Services, Inc.). Victim J.S. said that, during this October 20, 2016 meeting, Victim J.S. provided BOOY with an additional $3,000 investment, and BOOY gave B.S. a corresponding handwritten receipt. U.S. Bank records provided by Victim J.S. to investigators show that Victim J.S. wrote a check from his personal account at U.S. Bank dated October 20, 2016, which Victim J.S. paid to BOOY's company, "Principal Financial Strategies."

61.     Victim J.S. also told investigators that, after BOOY met with Victim J.S. on October 20, 2016, BOOY sent Victim J.S. a package via FedEx, which contained a certificate.   More specifically, according to records Victim J.S. provided to investigators, Victim J.S. received a "Principal Financial Strategies Certificate of Deposit" dated October 20, 2016, for a $55,500 deposit with a one-year "term of deposit" and 5% interest rate. The certificate reads, in part, "This is to certify that the holder of this certificate . . . is a depositor through Safe Financial Strategies, LLC." Victim J.S.'s records from BOOY also include a Principal Financial Strategies Contract Statement, which states that the "value" of Victim J.S.'s "contract" increased from $51,500.00 "as of July 22, 2016," to $55,500.00 "as of October 20, 2016." This Contract Statement also states:

A percentage of any interest you earn is added to your account at the end of each annuity year according to a fixed schedule. The percentage increases in equal monthly increments until 100% is reached at the end of the term. This rate is guaranteed, so your contract will not lose value due to poor performance of any market index. For questions, please contact your agent, Richard Booy, at (224) 206-8617."

62.    Victim D.S. (who, as described above, is the daughter of Victim E.H., who died in March 2016, and who previously gave BOOY $194,230.00 in June 2014) told investigators on December 14, 2016, that Victim D.S. and her husband, K.S., continued to research BOOY and learned of the suit filed against BOOY (in September 2016). According to Victim D.S., BOOY told Victim D.S. in a phone call that it was just a civil lawsuit and that Victim D.S.'s late mother's money was "real" and, if Victim D.S. did not believe BOOY, then Victim D.S. could also get a lawyer. Next, Victim D.S. told investigators that sometime in November 2016, BOOY advised Victim D.S. to call (800) 628-3886 Ext 12, to get more information about Victim D.S.'s late mother's Principal CD. Victim D.S. said that she called this number and left a message, but Victim D.S. was concerned because the recording did not identify the party as BOOY's company, Safe Financial Strategies. According to Victim D.S., a woman did call Victim D.S. back, and the woman told Victim D.S. that it would take about a year to get the money back. Victim D.S. recalled that the woman's last name may have been "Washington." Victim D.S. told investigators that Victim D.S. was concerned because the woman on the phone could not even provide Victim D.S. with the value of her mother's Principal CD. Victim D.S. said that her husband researched the (800) number that BOOY provided them, and that Victim D.S.'s husband learned that the number appeared to belong to a mill in Idaho. After learning this, Victim

D.S. said that she texted BOOY about the (800) number, and BOOY texted a responding message to Victim D.S. stating that BOOY would look into it.

63.     G.M. of Bloomington, Illinois, was interviewed by investigators on December 12, 2016. G.M. said that his mother (Victim J.M.) died in December 2015. After Victim J.M.'s death, G.M. went through Victim J.M.'s records and discovered four "records of deposits" totaling $107,547.22, which indicated his mother (Victim J.M.) had given that amount to BOOY. G.M. said he does not know how BOOY got the money from Victim J.M. According to G.M., he contacted BOOY to discuss and to get Victim J.M.'s money. G.M. said that the process of getting the returned funds was very difficult and was always met with haggling and excuses from BOOY. At some point, BOOY provided G.M. with the number (800) 628-3886 for the "Safe Financial Group" headquarters. G.M. said that he called the number and spoke with a "Susan Washington" in Iowa. According to G.M., "Susan Washington" told G.M. that she would try to do a special release to get Victim J.M.'s funds returned to G.M. However, G.M. said that the funds were never released to him, and G.M. suspected the (800) number to be a fake.

64.     G.M. said that he eventually received four separate payments from BOOY totaling $80,174.58, which occurred on May 2, 2016; May 20, 2016; June 21, 2016; and September 12, 2016. G.M said that BOOY stated that G.M. "was one of the lucky ones and that most of the others were not even getting their money back at this time." G.M. said that he was in communication with BOOY as recently as two

days prior to G.M.'s December 12, 2016 interview with investigators because G.M. is still trying to get back the rest of Victim J.M.'s money from BOOY.

65. On December 21, 2016, I reviewed the website http://www.ipodiums.net/members/rb1/LCTP125.html. The website indicates it is "From: Richard Booy." Among other statements, the website states "See How YOU Can Grow Your Retirement Savings," including "How to receive GUARANTEED INCOME for life" and "How to get TRIPLE COMPOUNDING on CD money." The website also lists the phone number (224) 206-8617, which I know from my review of records provided by victims, including but not limited to, Victim M.S. and the Victim Church, is the same phone number that BOOY used on such records as BOOY's business card and typed receipts, among other records. This website also contains an audio recorded message, which I have reviewed. Among other things, the speaker in this audio recording states:

> Thank you for visiting our website. Do you want to grow your retirement savings? Does guaranteed income for life sound good to you? Then just complete the form on the right side of our website, and we'll send you the information.

This audio recorded message file on the website is located immediately next to a picture of a white male. On December 21, 2016, I spoke with Victim D.W., who had previously met with BOOY. Victim D.W. told me on December 21, 2016, that Victim D.W. recognized the voice on this website to be BOOY's voice and recognized the photograph on this site was also BOOY. This website also has an on-line "form" where the reader is invited to provide his or her name, email address, and phone number. As noted previously, at two least victims (J.S. and M.C.) indicated that they

were contacted by BOOY after they first went to a website, and M.C. specifically recalled providing contact information in an on-line form that M.C. submitted before M.C. was contacted by BOOY.

### Request for the Issuance of a Criminal Complaint in the Northern District of Illinois

66.     Based upon the foregoing information, there is probable cause to believe that, beginning in or about June 2014 and continuing to in or about December 2016, BOOY devised, intended to devise and participated in a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and by concealment of material facts, and for the purpose of executing the scheme, and attempting to do so, used and caused to be used a commercial interstate carrier. In particular, for the purpose of executing the scheme to defraud, and attempting to do so, on or about October 21, 2015, BOOY knowingly caused to be transmitted by means of a mailing via FedEx from BOOY to Victim R.O., an envelope containing instructions for Victim R.O. to send additional money to BOOY for investment, in violation of Title 18, United States Code, Section 1341.

### Request for Issuance of Search Warrants on the Subject Hard Drive and Subject Email Account in the Northern District of Illinois

**I.      SPECIFICS REGARDING ITEMS TO BE SEIZED**

      A.     Search Warrant for the Subject Hard Drive

67.     Based on the information set forth above and immediately below, I believe there is probable cause to conclude that within the **Subject Hard Drive**

there is evidence, fruits, and instrumentalities of the Subject Offense. Accordingly, I request that the Court issue a search warrant for the **Subject Hard Drive** for the items set forth in Attachment B to this affidavit.

68.     Based on the information set forth above, my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I know that it is common for companies involved in investing and financial advice, such as brokers, insurance agents, and financial advisors, to keep records relating to the following:

a.      records (in either electronic or paper form) relating to the solicitation of potential customers for services, including, but not limited to, promotional flyers, letters, emails, as well as advertisements, lists of clients, lists of residential addresses, written sales and promotional scripts and talking points;

b.      records (in either electronic or paper form) relating to sales and client transactions, including, but not limited to, financial statements, correspondence, spreadsheets, email messages, records documenting the type of financing services rendered or purchased, including customer lists, transaction dates, the cost of services to be rendered, as well as invoices, letters, and contracts;

c.      records (in either electronic or paper form) relating to employees and business associates, including but not limited to, contact books, ledgers, invoices, email communications, correspondence, payments, etc., concerning clients and parties with whom BOOY did business.

69.     Based on my training and experience, I know that it is necessary for a profit-producing business like BOOY's, even one involved in fraudulent transactions, to maintain other books and records sufficient to operate the business and to track income and expenses.  These records typically include (in either electronic or paper form): ledgers, journals, receipts, invoices, bank statements, income tax returns, purchase and sales records, accounts payable and receivable records, customers' files, and payroll records.

70.     Based on my training and experience, I know that it is common practice for individuals who are involved in business activities of any nature to maintain books, records, and notes of such business activities for lengthy periods of time, and that individuals who maintain these records keep them in places that are secure but easily accessible, such as in their business offices.

71.     Based on my training and experience, I also know that individuals in business communicate about the business—including its sales, customers, business plans, profits, *etc.*—in many forms, including via paper memoranda and emails. These communications are often stored at the business location and on computers and on computer servers maintained by the business.

72.     Based on my training and experience, I know that businesses keep financial records in many forms, including electronically.  Consequently, I believe that the documents sought by the search warrant may be stored on BOOY's computer, which, in turn, has been reproduced on the **Subject Hard Drive**.  The protocol for

the search of the **Subject Hard Drive** pursuant to this warrant are set forth below and in the Addendum to Attachment B.

<u>Specifics Regarding the Searches of Computer Systems</u>

73. Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the

40

integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

74.    In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

75.    In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## **Procedures to be Followed in Searching the Computers**

76.    The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

77.    With respect to the search of any computers or electronic storage devices seized from the location identified in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques

(the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a.    examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

    b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above);

    c.    surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

    d.    opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

    e.    scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

      f.     performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

      B.     <u>The Subject Email Account</u>

78.    Based on the information above, my training and experience, and the training and experience of other law enforcement officers involved in this investigation, I know that businesses, including those engaged in investments and financial advising, use email to communicate about their business, including, but not limited to, communications regarding internal business operations and finances, as well as communications with, for example, customers, employees, banks, and insurance companies. As examples, as explained above, BOOY has sent and received email using the **Subject Email Account**, which included providing purported advice, receiving documents from victims, and providing sales and promotional information, as well as having the **Subject Email Account** on file with the bank where BOOY conducted most of the transactions throughout 2014 to 2016.

79.    Based on my training and experience, I have learned the following about Comcast:

      a.     Comcast is an email service which is available to Internet users. Subscribers obtain an account by registering on the Internet with Comcast. Comcast requests subscribers to provide basic information, such as name, gender, zip code and other personal/biographical information;

43

b.      Comcast maintains electronic records pertaining to the individuals and companies for which they maintain subscriber accounts. These records often include account access information, email transaction information, and account application information;

c.      Any email that is sent to a Comcast subscriber is stored in the subscriber's "mail box" on Comcast's servers until the subscriber deletes the email or the subscriber's mailbox exceeds the storage limits preset by Comcast. If the message is not deleted by the subscriber, the account is below the maximum storage limit, and the subscriber accesses the account periodically, that message can remain on Comcast's servers indefinitely;

d.      When the subscriber sends an email, it is initiated by the user, transferred via the Internet to Comcast's servers, and then transmitted to its end destination. Comcast users have the option of saving a copy of the email sent. Unless the sender of the email specifically deletes the email from the Comcast server, the email can remain on the system indefinitely; and

e.      An Comcast subscriber can store files, including emails and image files, on servers maintained and/or owned by Comcast.

80.     Based on the information set forth in this affidavit, law enforcement officers want to search the **Subject Email Account** for evidence of violations of the Subject Offense.

81.     In order to facilitate seizure by law enforcement of the records and information described in Attachment C, this affidavit and application for search

44

warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to permit employees of Comcast to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

      a.    The search warrant will be presented to Comcast personnel who will be directed to the information described in Section II of Attachment C;

      b.    In order to minimize any disruption of computer service to innocent third parties, Comcast employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II of Attachment C.

82.    Comcast employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and following the protocol set out in the Addendum to Attachment C, law enforcement personnel will thereafter review all information and records received from Comcast employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment C.

## CONCLUSION

83.    Based on the above information, I respectfully submit that there is probable cause to believe that a mail fraud offense, in violation of Title 18, United States Code, Section 1341 has been committed, and that:

a) evidence, instrumentalities, and fruits relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Hard Drive**, as further described in Attachment A; and

b) evidence relating to this criminal conduct, as further described in Part II of Attachment C, will be found in the **Subject Email Account**, as further described in Part II of Attachment C.

84.     Therefore, I respectfully request that this Court issue: (1) a warrant for the arrest of RICHARD K. BOOY; (2) a search warrant for the **Subject Hard Drive** more particularly described in Attachment A, authorizing the seizure and search of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B; and (3) a search warrant for the **Subject Email Account**, which is further described in Part II of Attachment C.

FURTHER AFFIANT SAYETH NOT.

Eduardo Andrade
Inspector
U.S. Postal Inspection Service


Subscribed and sworn
before me this 21 day of December 2016

Honorable M. David Weisman
United States Magistrate Judge

46